UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------------X

RAYNE VALENTINE,

                                           Plaintiff,

                -against-

THE CITY OF NEW YORK; MAYOR BILL DE BLASIO; NEW
YORK CITY POLICE DEPARTMENT ("NYPD")
COMMISSIONER DERMOT SHEA; NYPD OFFICER DIMITRI
KALININ, SHIELD NUMBER 27547; NYPD OFFICER MICHAEL
LICATA, SHIELD NUMBER 27684;  NYPD OFFICER ALNALDO
RODRIGUEZ, SHIELD NUMBER 27536;  NYPD OFFICER DOUGLAS
SHEEHAN, SHIELD NUMBER 26759;  NYPD OFFICER ARTHUR
VANZILEN, SHIELD NUMBER 29090; NYPD OFFICER JOHN
VARGAS, SHIELD NUMBER 16643; NYPD OFFICER
NASIMDZHON MELIKOV, TAX REGISTRY NUMBER 964164;
NYPD OFFICER STEVEN ZANCA, SHIED NUMBER 4377; NYPD
SERGEANT ROBERT BELLANTONIO, TAX REGISTRY NO.
948651; NYPD SERGEANT MATTHEW JOZWICKI, SHIELD
NUMBER 04905; NYPD SERGEANT BILL MORRISSEY; NYPD
DETECTIVE GABRIEL ECHEVARRIA, SHIELD NUMBER 6488; NYPD
DETECTIVE RAYMOND GORDON, SHIELD NUMBER 4592; NYPD
DETECTIVE JOHN HOLLAND, SHIELD NUMBER 4102;NYPD
DETECTIVE AMJAD KASAJI, SHIELD NO. 6901; NYPD
DETECTIVE WARREN ROHAN, SHIELD NUMBER 2378; NYPD
DETECTIVE MICHAEL SCOLOVENO, SHIELD NUMBER 5901; NYPD
DETECTIVE ANIBAL TORRES, SHIELD NUMBER 2123; and NYPD
MEMBERS JOHN DOES 1-11,

                                    Defendants.

-----------------------------------------------------------------------------------X

**FIRST AMENDED
COMPLAINT**

**Index No. 21-cv-4867
(AMD)(VMS)**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff RAYNE VALENTINE, by his attorneys, Gideon Orion Oliver and Cohen &

Green PLLC, hereby complains of the Defendants as follows:

## PRELIMINARY STATEMENT

1.      Soon after midnight on May 31, 2020, Plaintiff RAYNE VALENTINE (Mr.

Valentine; he/him) – a United States Marine Veteran who was on his way home from working a

shift at Kings County Hospital at the height of the global COVID-19 Pandemic – came upon

NYPD members, including Defendant NYPD DETECTIVE AMJAD KASAJI and a number of

NYPD JOHN DOE Defendants, chasing a young person in a yellow and black hoodie. After Mr. Valentine began to record them from a safe distance away, Defendant Kasaji and a number of NYPD members retaliated against him, pushing him to the ground and assaulting him. When they eventually stopped, Mr. Valentine returned to the Emergency Room of the hospital he had just left, where he was treated over the course of several hours, receiving seven staples to close a large headwound caused by the beating.

2.      NYPD members learned of the attack on Mr. Valentine very quickly. Multiple NYPD members questioned Mr. Kasaji and viewed his video at the hospital – then treated him as if he had done something wrong, and in substance threatened him rather than helped him. And then, the day after Mr. Valentine was released, on two occasions, other NYPD members believed to be with its Internal Affairs Bureau ("IAB") tried to get past the concierge in the residence where Mr. Valentine was staying, in one case successfully, although they knew, or should have known, that Mr. Valentine was represented by legal counsel, and only wanted to be contacted by NYPD members through legal counsel, at that point. A few days after that, an IAB member attempted to contact Mr. Valentine – this time by phone. When legal counsel responded with questions, the IAB member represented that the IAB had never been to Mr. Valentine's residence, and would not do that, and refused to answer any questions.

3.      In sum, the NYPD's knowledge of Mr. Valentine's assault has resulted primarily in harassment from the police, not any measure of accountability, discipline, or justice.

4.      Mr. Valentine now brings this suit seeking some redress for violations of his federal and state civil and constitutional rights.

———————————

## JURISDICTION AND VENUE

5.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and New York law.

6.      This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

7.      Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.,* in the Eastern District of New York, where the Plaintiff resides, Defendant City of New York has offices, and the majority of the actions complained of herein occurred.

## PARTIES

8.      At all times mentioned herein, Plaintiff RAYNE VALENTINE (Mr. Valentine; he/him) was a resident of Kings County in the City and State of New York.

9.      At all relevant times mentioned herein, Defendant CITY OF NEW YORK (the "City") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

10.     Defendant New York City Mayor BILL DE BLASIO was, at all times relevant to this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," *see* NYC Charter Section 3, and had final authority to appoint and/or remove the New York City Police Commissioner.

11.     Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner,

Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable.

12. At all times hereinafter mentioned, Defendant City employed Defendants NYPD OFFICER DIMITRI KALININ, SHIELD NUMBER 27547; NYPD OFFICER MICHAEL LICATA, SHIELD NUMBER 27684; NYPD OFFICER ALNALDO RODRIGUEZ, SHIELD NUMBER 27536; NYPD OFFICER DOUGLAS SHEEHAN, SHIELD NUMBER 26759; NYPD OFFICER ARTHUR VANZILEN, SHIELD NUMBER 29090; NYPD OFFICER JOHN VARGAS, SHIELD NUMBER 16643; NYPD OFFICER NASIMDZHON MELIKOV, TAX REGISTRY NUMBER 964164; NYPD OFFICER STEVEN ZANCA, SHIED NUMBER 4377; NYPD SERGEANT ROBERT BELLANTONIO, TAX REGISTRY NO. 948651; NYPD SERGEANT MATTHEW JOZWICKI, SHIELD NUMBER 04905; NYPD SERGEANT BILL MORRISSEY; NYPD DETECTIVE GABRIEL ECHEVARRIA, SHIELD NUMBER 6488; NYPD DETECTIVE RAYMOND GORDON, SHIELD NUMBER 4592; NYPD DETECTIVE JOHN HOLLAND, SHIELD NUMBER 4102; NYPD DETECTIVE AMJAD KASAJI, SHIELD NO. 6901; NYPD DETECTIVE WARREN ROHAN, SHIELD NUMBER 2378; NYPD DETECTIVE MICHAEL SCOLOVENO, SHIELD NUMBER 5901; NYPD DETECTIVE ANIBAL TORRES, SHIELD NUMBER 2123, and Defendants JOHN DOES 1-11, each of whom violated Plaintiff's rights, as set forth more fully below.

13. At all times hereinafter mentioned, Defendants John Does 1-4, were adult men employed by the City of New York as members of the NYPD and whose names are currently unknown to Plaintiff. Does 1-4 appeared to be men wearing blue NYPD uniforms and riot gear helmets. Upon information and belief, Does 1-4 included NYPD Officer Dimitri Kalinin, Shield

4

Number 27547; NYPD Officer Michael Licata, Shield Number 27684; NYPD Officer Alnaldo

Rodriguez, Shield Number 27536; NYPD Officer Douglas Sheehan, Shield Number 26759;

NYPD Officer Arthur Vanzilen, Shield Number 29090; NYPD Officer John Vargas, Shield

Number 16643; NYPD Officer Steven Zanca, Shied Number 4377; NYPD Sergeant Matthew

Jozwicki, Shield Number 04905; NYPD Detective Gabriel Echevarria, Shield Number 6488;

NYPD Detective Raymond Gordon, Shield Number 4592; NYPD Detective John Holland,

Shield Number 4102; NYPD Detective Warren Rohan, Shield Number 2378; NYPD Detective

Michael Scoloveno, Shield Number 5901; and/or NYPD Detective Anibal Torres, Shield

Number 2123. The basis of that information and belief is that Defendant City identified each of

those 14 individuals as "the John Doe Defendants believed to be present during the incident

alleged in the complaint."

14.     At all times hereinafter mentioned, Defendants John Does 5-8 were employed by

the City of New York as members of the NYPD and whose names are currently unknown to

Plaintiff. Upon information and belief, Does 5-8 included NYPD Officer Nasimdzhon Melikov,

Tax Registry Number 964164; NYPD Officer John Vargas, Shield Number 16643; and NYPD

Sergeant Robert Bellantonio, Tax Registry No. 948651. The basis of that information and belief

is documents provided by Defendant City on January 31, 2022 in response to a January 28, 2022

Order from Hon. Vera M. Scanlon in this matter directing Defendants to provide "information

sufficient to identify the Doe Defendants."

15.     At all times hereinafter mentioned, Defendants John Does 9-11 were employed by

the City of New York as members of the NYPD and whose names are currently unknown to

Plaintiff.

16.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

17.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

18.     At all relevant times, Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

19.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

20.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

21.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

22.     Each individual Defendant is sued in her or his individual and official capacities.

**GENERAL MUNICIPAL LAW COMPLIANCE**

23.     Plaintiff timely served a Notice of Claim on Defendant City of New York on August 31, 2020, and complied with all conditions precedent to commencing an action under New York law.

24.     At least thirty days have elapsed since August 13, 2020 and adjustment and payment thereof has been neglected or refused.

25.     This action has been initiated within one year and ninety days of the accrual of Plaintiff's claims under New York law.

**STATEMENT OF FACTS**

26.     On May 25, 2020, Minneapolis police murdered George Floyd. Almost immediately, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest.

27.     In the following days and weeks, at the height of the COVID-19 public health pandemic, the New York City Police Department ("NYPD") and NYPD members engaged in activities that violated the constitutional and other legal rights of individuals who were protesting police misconduct, as well as bystanders and observers such as Mr. Valentine.

28.     The City's and NYPD's responses to the summer 2020 Black Lives Matter protests (the "Summer 2020 Protests") were the subject of public scrutiny as they unfolded and have since given rise to substantial litigation in federal and state courts as well as investigations by the New York State Attorney General, the New York City Council, and other governmental agencies.

29.     Plaintiff incorporates by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the reports issued by the New York State Office of the Attorney General, the New York City Office of the Corporation Counsel, and the New York City Department of Investigation.[1]

30.     Plaintiff incorporates by reference any factual allegations set forth in other federal civil rights complaints in cases pending in the United States District Court for the Eastern District of New York arising from Defendants' responses to the Summer 2020 Protests that support Plaintiff's claims against Defendants in this case, including:

    a.  *Ezagui v. City of New York et al.*, 20-cv-06360 (DG)(SJB);

    b.  *Fraser v. City of New York et al.*, 20-cv-05741 (NGG)(MMH);

    c.  *Gelbard et al. v. City of New York et al*, 20-cv-03163(MKB)(RER);

    d.  *Jefferey et al. v. City of New York et al.*, 20-cv-02843 (NGG)(RML);

    e.  *Richardson and Myrie v. City of New York et al*., 21-cv-03609 (LDH)(SJB);

    f.  *Smith v. City of New York et al*., 21-cv-03096 (DG)(TAM); and

    g.  *Zayer v. City of New York et al.*, 20-cv-06070 (ARR)(PK).

31.     Plaintiff incorporates by reference any factual allegations set forth in other federal civil rights complaints in cases pending in the United States District Court for the Southern

---

[1] Letitia James, Attorney General, State of New York, *Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd,* available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf; Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), available at https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

District of New York arising from Defendants' responses to the Summer 2020 Protests that support Plaintiff's claims against Defendants in this case, including:

      h.  *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

      i.  *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

      j.  *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

      k.  *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

      l.  *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

      m.  *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

      n.  *Campbell v. City of New York,* 21-cv-04056 (AJN); and

      o.  *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG).

## **PLAINTIFF RAYNE VALENTINE'S MAY 31, 2020 EXPERIENCES**

32.    On May 30, 2020, Mr. Valentine was working at Kings County Hospital, where he had worked throughout the COVID-19 pandemic, moving patients and medicine throughout the hospital and, to his horror, transporting hundreds of dead bodies into refrigerated trucks.

33.    Just before midnight on May 30, 2020, Mr. Valentine finished his shift and begun walking to take a subway to a hotel for essential workers.

34.    On May 31, 2020, soon after midnight, Mr. Valentine reached the subway entrance near Nostrand Avenue at its intersection with Church Avenue in Brooklyn.

35.    At or near there Mr. Valentine came upon NYPD members chasing and then using force on a young person in a yellow and black hoodie.

36.    Mr. Valentine began recording NYPD members Defendants Kasaji and Does 1-4 with his phone from a safe distance away.

37.     Defendants Kasaji and Does 1-4 appeared to be wearing riot gear including helmets.

38.     The video Mr. Valentine recorded was published online by *The Daily Beast* on June 2, 2020 here: https://www.thedailybeast.com/even-medical-workers-fighting-covid-say-cops-are-attacking-them-at-george-floyd-protests?jwsource=cl.

39.     Defendant Kasaji then approached Mr. Valentine while swinging his NYPD-issued baton or asp, shouting at Mr. Valentine to move back.

40.     Mr. Valentine complied with this command by walking backwards and saying, "I am moving back!"

41.     As Mr. Valentine backed up, Defendant Kasaji or another one of Does 1-4 pushed him to the ground, causing Mr. Valentine's phone to drop to the ground.

42.     Defendants Kasaji and Does 1-4 then beat Plaintiff while he was on the ground by, *inter alia*, striking Plaintiff on his head, ribs, chest, right wrist, right arm, and right leg with their batons and/or asps.

43.     Defendants Kasaji and Does 1-4 stopped beating Mr. Valentine.

44.      One of Kasaji or Does 1-4 threw Mr. Valentine's cell phone at him as he lay on the ground and told Mr. Valentine in sum and substance "get out of here".

45.     During the encounter, Mr. Valentine told Defendants Kasaji and Does 1-4, "I'm just trying to go home," but one of them responded in substance: "Well, you picked the wrong time to do that."

46.     Following the beating, Mr. Valentine picked himself up, left quickly, and walked back to Kings County Hospital, where he had just left from work.

47.     As Mr. Valentine walked back to the hospital, blood streamed down his face from a large, open head wound:



48.     Defendants Kasaji and Does 1-4 also caused Mr. Valentine other physical injuries, including, but not limited to, pain and bruising to Mr. Valentine's right wrist, right forearm, and right leg, and pain in Mr. Valentine's right thigh, ribs, and chest.

49.     After arriving at the hospital, over the course of around seven hours, staff treated Mr. Valentine for his injuries in the Emergency Room and then at the Critical Care Trauma Unit.

50.     For example, Mr. Valentine received seven staples to close the deep, bloody laceration to his head.

51.     Mr. Valentine missed about 3 days of work as a result of the beating, and was otherwise injured.

## THE NYPD'S FAILURES TO INVESTIGATE OR DISCIPLINE INVOLVED NYPD MEMBERS

52.     While at the hospital, Mr. Valentine told staff that he had been assaulted by police.

53.     NYPD members soon learned that Mr. Valentine had reported that he had been assaulted by police.

54.     However, Rather than investigating the attack and/or disciplining the NYPD members who were involved, NYPD Members John Does 5-10 and other NYPD members harassed, threatened, and intimidated Mr. Valentine, and violated his privacy.

55.     While Mr. Valentine was at Kings County Hospital, NYPD Members John Does 5 and 6 questioned Mr. Valentine about the assault, without reading him his *Miranda* rights and without counsel present, and viewed Mr. Valentine's cell phone video.

56.     NYPD Members John Does 7 and 8 then again questioned Mr. Valentine, again without reading Mr. Valentine his *Miranda* rights and without counsel present, and viewed Mr. Valentine's cell phone video.

57.     One of Does 5-8 used his cell phone to take a video of Mr. Valentine's cell phone video.

58.     Doe 8 then began making threatening comments to Mr. Valentine, including, but not limited to, falsely suggesting that Mr. Valentine had been rioting before the Defendants beat him, falsely stating that Mr. Valentine had not complied with police orders and falsely implying that Mr. Valentine deserved to be beaten, and stating words to the effect of: "We can arrest you tonight for rioting."

12

59.     There was in fact no basis to arrest Mr. Valentine for rioting, or anything else.

60.     Mr. Valentine was released from Kings County Hospital on the morning of May 31, 2020.

61.     Later in the morning of May 31, 2020, without Plaintiff's consent, Defendants NYPD Sergeant Bill Morrissey and NYPD Members John Does 9-10 then went to Mr. Valentine's residence, which has a concierge to prevent people from passing the lobby without a resident's consent.

62.     Mr. Valentine did not consent to talking with Defendants Morrissey or Does 9-10 except through counsel.

63.     Upon information and belief, Defendants Morrissey and Does 9-10 were instructed through staff at the residence that they did not have consent to enter, and to leave contact information rather than going up to Mr. Valentine's apartment.

64.     Defendants Morrissey and Does 9-10 eventually left, and left contact information for Defendant Morrissey.

65.     Shortly thereafter, Mr. Valentine's counsel called Defendant Morrissey and told them that Mr. Valentine was represented by counsel and that they were not to contact him directly, and that they should contact Mr. Valentine's counsel instead.

66.     Mr. Valentine's counsel consented to the Duty Captain calling Mr. Valentine's counsel.

67.     Within 15 minutes of Mr. Valentine's counsel's call with Defendant Morrissey, instead of calling Mr. Valentine's counsel, Defendant NYPD Duty Captain John Doe 11 went past the concierge at Mr. Valentine's residence without his consent, went to Mr. Valentine's apartment door and tried to get Mr. Valentine to let him in.

13

68.     Mr. Valentine told Defendant Doe 11 that he did not consent to his being there and that he did not consent to speaking to him except through counsel.

69.     Mr. Valentine then called counsel, and counsel communicated through the speaker of Mr. Valentine's phone personally to Defendant Doe 11 that they should leave Mr. Valentine's apartment door, and instead call Mr. Valentine's counsel.

70.     Although Defendant Doe 11 eventually left, counsel never received a return call from him or anyone else at the NYPD.

71.     Instead, on June 4, 2020, NYPD IAB Detective First Name Unknown ("FNU") Rodriguez called Mr. Valentine directly, violating Mr. Valentine's and counsel's multiple requests that the NYPD contact Mr. Valentine only through counsel.

72.     When Mr. Valentine's legal counsel contacted Detective Rodriguez in response, Rodriguez said that her June 4, 2020 call to Mr. Valentine was the first contact from IAB about the case, and the no one from IAB had gone to Mr. Valentine's apartment, and that they would not do that.

73.     As seen above, NYPD members conducted two interviews of Mr. Valentine at the hospital and two visits to Mr. Valentine's apartment on May 31, 2020 without his consent.

74.     In an e-mail dated June 5, 2020 to Det. Rodriguez, *inter alia*, Mr. Valentine's counsel complained of the conduct of the NYPD members who had appeared at Mr. Valentine's residence on May 31, 2020 and requested the names, ranks, and shield numbers of the John Doe NYPD members who had been involved, as well as the descriptions of their relationships to Det. Rodriguez's investigation, and any notes or recordings they made.

75.     Also on June 5, 2020, a NYPD IAB Sergeant refused to answer those questions or provide any further information.

14

## FIRST CLAIM FOR RELIEF

**For Violations of Plaintiff's First Amendment Rights,
Including Under First Amendment – Retaliation and Time/Place/Manner Theories of
Liability**

**Against Defendants Kasaji, Does 1-4, and each individual NYPD member who participated
in violating Plaintiff's rights and/or failed to intervene and/or supervise subordinates
related to their violations of Plaintiff's rights**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First
and Fourteenth Amendments to the United States Constitution*

76.     Plaintiff incorporates by reference the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

77.     Mr. Valentine had a clearly established, First Amendment right to witness and

record NYPD members swarming and using force on a young person from a safe distance away,

as he was doing.

78.     Defendants retaliated against Plaintiff for engaging in speech and/or conduct

protected by the First Amendment.

79.     Defendants engaged in the acts and omissions complained of herein in retaliation

for Plaintiff's protected speech and/or conduct.

80.     Defendants engaged in the acts and omissions complained of herein in order to

prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

81.     Defendants engaged in the acts and omissions complained of herein in order to

prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

82.     Additionally, as discussed elsewhere herein, Defendant City designed and/or

implemented policies and practices pursuant to which those Defendants who implemented them

subjected Plaintiff to violations of his First Amendment rights.

83.     Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

84.     Defendants imposed restrictions on Plaintiff's protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in unreasonably limiting Plaintiff's witnessing and recording their police actions in the public streets, in retaliating against Plaintiff for engaging in that protected conduct, in subjecting Plaintiff to excessive force, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

85.     In addition to being retaliatory, the restrictions Plaintiff complained of herein that Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiff's protected conduct that:

a.     Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b.     Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

c.     Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

86.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

87.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force

**Against Defendants Kasaji, Does 1-4, and each individual NYPD member who participated in violating Plaintiff's rights and/or failed to intervene and/or supervise subordinates related to their violations of Plaintiff's rights**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

88.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

89.     Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

90.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

91.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest

**Against Defendants Kasaji, Does 1-4, and each individual NYPD member who participated in violating Plaintiff's rights and/or failed to intervene and/or supervise subordinates related to their violations of Plaintiff's rights**

*Pursuant to* ==42 U.S.C. § 1983== *for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

92.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

93.     Defendants seized Mr. Valentine without a judicial warrant authorizing them to seize Plaintiff.

94.     Defendants seized Mr. Valentine without privilege or lawful justification.

95.     Defendants' seizure of Mr. Valentine was was unreasonable.

96.     Plaintiff did not consent to and was conscious of his confinement by Defendants.

97.     Defendants did not have probable cause to seize, detain, or arrest Plaintiff.

98.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

99.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

**Municipal Liability**

**Against Defendant City of New York**

*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution*

100.    Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

101.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio and Defendant Shea; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea and other policymaking officials; (d) and Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, including Defendants Kasaji and Does 1-4, despite full knowledge of their wrongful acts, as described herein and otherwise.

102.    Plaintiff incorporates by reference the allegations in the Complaint in *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG) supporting the municipal liability claim therein, including, but not limited to, the allegations in ¶¶ 2-7 and 95-129 therein. A copy of the *Gray* Complaint is attached hereto as **Exhibit A** and incorporated by reference.

19

103.    As stated in ¶ 7 of the *Gray* Complaint:

The NYPD has demonstrated a longstanding custom, pattern and practice of unlawfully interfering with the recording of police activity conducted in public view – a pattern revealed with clarity during the protests in New York City following the death of George Floyd in the summer of 2020 (the "George Floyd Protests"). This custom, pattern, and practice is the result of a lack of adequate training regarding the First Amendment rights of the press and public to record police activities in public, a failure to supervise and discipline officers who retaliate against or interfere with this right, and deliberate indifference by NYPD supervising personnel to a culture of disregard for the constitutional right to record police activity in public.

104.    In this case, in addition to failing to train Defendants Kasaji and Does 1-4 related to Mr. Valentine's rights to witness and record public police activity as he was doing, Defendants City, de Blasio, and Shea failed to supervise or discipline Defendants Kasaji and Does 1-4.

105.    Relatedly, Defendants de Blasio and Shea knew, or should have known, about Mr. Valentine's assault, and have failed to supervise or discipline or take other remedial action, effectively ratifying the Defendants' Kasaji's and Does 1-4's misconduct.

106.    For example, setting aside the two statements Mr. Valentine gave to the John Doe NYPD members described above on May 31, 2021, Mr. Valentine gave multiple, high-profile media interviews that were published in *The Daily Beast*, *The Daily Mail UK, The Washington Post,* and a live interview by Katie Tur on *MSNBC* in May and June of 2020, and Mr. Valentine's case resulted in a complaint to the Civilian Complaint Review Board.

107.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

108.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**FIFTH CLAIM FOR RELIEF**

**Violations of New York State Law**

**Against All Defendants**

***Pursuant to New York State Common Law and the New York State Constitution and***

109.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

***Respondeat Superior* Liability**

110.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

**Assault**

111.    Defendants committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

**Battery**

112.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiffs without Plaintiff's consent.

**New York Civil Rights Law § 79-P**

113.    Prior to his assault and battery, Mr. Valentine had been exercising his rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity and to maintain custody and control over the phone on which he was doing so.

114.    Prior to his assault and battery, Mr. Valentine had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

115.    Defendants Kasaji and Does 1-4 assaulted and battered Mr. Valentine, causing him to cease recording and lose custody and control of the phone on which he had been recording, intentionally preventing him from further recording law enforcement activity.

**False Imprisonment and Unreasonable Detention**

116.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiff was conscious of the confinement and it was without Plaintiff's consent.

**Negligent Training and Supervision**

117.    Defendant City negligently trained supervised, and trained Defendants Kasaji and Does 1-4.

**Violations of the New York State Constitution**

118.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and/or 12 of the New York State Constitution.

22

119.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and/or 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

120.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

121.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

i.      Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.     Actual damages in an amount to be determined at trial against the City of New York;

iii.    Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia*, 42 U.S.C. §1988, New York Civil Rights Law § 79-P(3)(d), and New York common law; and

iv.     Such other relief as the Court deems just and proper.

Dated:  Brooklyn, New York
        February 1, 2022

**GIDEON ORION OLIVER**


277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com


**COHEN&GREEN P.L.L.C.**


By:  _____
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
   t: (929) 888-9480
   f: (929) 888-9457
   e: elena@femmelaw.com
      remy@femmelaw.com
      jessica@femmelaw.com