# NYC CIVILIAN COMPLAINT REVIEW BOARD

**ERIC L. ADAMS, Mayor**     **ARVA RICE, Interim Chair**     **JONATHAN DARCHE, Esq. Executive Director**



# 2020 NYC PROTESTS

# TABLE OF CONTENTS

AGENCY MISSION ............................................................................................................................. 2

THE BOARD AND AGENCY OPERATIONS ........................................................................................ 3

LETTER FROM THE CHAIR ................................................................................................................ 4

BACKGROUND AND EXECUTIVE SUMMARY .................................................................................... 5

METHODOLOGY AND SCOPE .......................................................................................................... 11

INVESTIGATIVE CHALLENGES ........................................................................................................ 12

PROTESTS WITH THE LARGEST NUMBER OF CCRB COMPLAINTS ............................................. 18

      NYPD PROTEST RESPONSE ................................................................................................ 25

FADO & U ALLEGATIONS RECEIVED BY THE CCRB .................................................................... 27

      USE OF FORCE ALLEGATIONS .............................................................................................. 28

      ABUSE OF AUTHORITY ALLEGATIONS .................................................................................. 32

      DISCOURTESY AND OFFENSIVE LANGUAGE ALLEGATIONS ................................................. 36

      UNTRUTHFUL STATEMENT ALLEGATIONS ............................................................................ 39

COMPLAINT DISPOSITIONS ............................................................................................................ 42

DISCIPLINARY RECOMMENDATIONS .............................................................................................. 45

COMPLAINANT DEMOGRAPHICS .................................................................................................... 50

RECOMMENDATIONS ...................................................................................................................... 52

APPENDIX A ................................................................................................................................... 54

APPENDIX B ................................................................................................................................... 60

APPENDIX C ................................................................................................................................... 72

APPENDIX D .................................................................................................................................. 112

APPENDIX E .................................................................................................................................. 129

## INVESTIGATIVE CHALLENGES

The CCRB faced several challenges investigating protest-related complaints, many of which led to complaints being closed as "Officer Unidentified" because the CCRB could not determine which officers were involved in the alleged misconduct. Chief among these challenges were: (1) the actions NYPD members took to conceal their identities, which prevented them from being identified by complainants, victims, and witnesses; (2) the NYPD's failure to track and document where officers, vehicles, and equipment were deployed; (3) the NYPD's failure to provide dispositive responses to requests for footage from BWCs and other NYPD-controlled cameras that resulted in delayed responses, false positives, false negatives, and inconsistent responses; and (4) investigative delays resulting from officers refusing to be interviewed remotely. Despite these challenges, CCRB investigators pursued every available avenue to obtain evidence and identify as many officers as possible.

### Challenge One: Concealment of Officer Identities

Of the 226 fully investigated complaints, 59 were closed as "Officer Unidentified." The Board was unable to identify the officers involved in a staggering 43% (609) of fully investigated allegations of protest-related misconduct[9]. As shown in Figure 2, that is almost four times the percentage of subject officers who could not be identified in non-protest complaints (11%).

Although identification of officers is generally more difficult during large scale events, like protests, and the use of masks as an appropriate safety measure to reduce virus transmission due to the COVID-19 pandemic added an additional layer of difficulty to the officer identification process, the CCRB found that purposeful actions by officers, such as obscuring their badges or refusing to provide civilians with their names and shield numbers, resulted in multiple members of service being unidentified, allowing them to escape accountability for their actions during the protests. This concealment occurred with such frequency that "obscuring shield" was given a dedicated misconduct allegation category when the Agency categorized the Abuse of Authority protest allegations.

*Figure 1: Complaints Closed As "Officer Unidentified"*

|                        | 2020 CCRB  | 2020 Protests |
|------------------------|-----------:|--------------:|
| Officer(s) Unidentified | 143 (10%) | 59 (26%)      |

*Figure 2: Fully Investigated Allegations Closed As "Officer Unidentified"*

|                        | 2020 CCRB  | 2020 Protests |
|------------------------|-----------:|--------------:|
| Officer(s) Unidentified | 891 (11%) | 609 (43%)     |

---

[9] The 609 allegations closed Officer Unidentified do not come solely from the 59 complaints closed Officer Unidentified. It is possible for individual allegations to be closed as officer unidentified in a complaint with a different overall disposition.

1. **Case Example - Intentional concealment of shield numbers with mourning bands, Officer Unidentified[10]**

   On June 6, 2020, at approximately 7:00 p.m. in Brooklyn, a civilian was attending a candlelight vigil honoring Breonna Taylor when she saw a uniformed officer who had a mourning band over her shield. When the officer walked by, the civilian asked the officer if she could uncover her shield number. The officer ignored her and walked away. The civilian was able to describe the officer's race, height, and build, however, without additional descriptive details, pertinent video evidence, or other witnesses, the investigation was unable to determine the identity of the subject officer. The Board closed the allegations as Officer Unidentified.

**Challenge Two: Deployment of Officers Without Documentation of their Whereabouts or Issued Equipment**

The CCRB uncovered numerous NYPD documentation and officer deployment tracking failures throughout the protests. In most instances, officers were deployed without tracking their whereabouts, which led to difficulty in determining the pool of officers from which subject officers could be identified. The CCRB found that NYPD detail rosters—rosters that track which officers are assigned to a precinct—were often incomplete and illegible, and crucial reports—such as TRI (Threat, Resistance, Injury) reports that document use of force and injuries to civilians and officers—often were not completed at all.

During their CCRB interviews, officers of various ranks stated that they could not identify the commanding officers who gave them directives and could not identify fellow ranked members of service with whom they had been deployed during the protests. Officers reported being deployed to multiple locations with officers from other precincts or reporting to other locations due to radio calls for assistance.

**Case Examples:** The cases below are examples of complaints where officers accused of misconduct could not be identified due to individual officer and departmental documentation failures.

1. **Lack of NYPD paperwork, Officer Unidentified[11]**

   On May 31, 2020, at approximately 11:00 p.m. in the Midtown East area of Manhattan, the witness was with her boyfriend and a friend when she saw a marked police van driving amongst a group of protesters. The van made multiple turns while it was within the crowd, driving very close to some protestors, but not making physical contact with them. The witness took a photograph of the van and the license plate, but she could only describe the driver as a white male in uniform. The witness' friend also could not describe the driver. Surveillance video from two nearby commercial buildings showed the van driving in the crowd of protesters, but the cameras were too far away to capture a clear image of the driver. NYPD documents identified the van as being assigned to the 14th Precinct. A record of the

---

[10] CCRB Case No. 202003985
[11] CCRB Case No. 202003765

van's movements showed that it mostly circulated in the downtown Manhattan area. A search for BWC footage from the van's assigned precinct yielded negative results. The NYPD stated that due to the chaos of the protests it did not maintain a log of which officers took out the van. Without more specific officer descriptions, and the lack of documentation from the NYPD regarding the vehicle's assignment, the investigation was unable to determine the identity of the subject officers driving the vehicle and the complaint was closed as "Officer Unidentified."

2. **Officers' identities could not be determined because they wore inaccurate helmets and body shields or lacked any visible identification, Officer Unidentified**[12]

   On June 4, 2020, at approximately 6:30 p.m. in the Mott Haven neighborhood of the Bronx, a civilian, a healthcare worker, and a friend were participating in a Black Lives Matter protest. At 7:30 p.m., officers began to encircle the protestors. When the curfew began at 8:00 p.m., the civilian witnessed his friend being arrested, officers grabbing a man off a bicycle and handcuffing him although he said that he was leaving the area, and several officers indiscriminately swinging their batons at protestors, sometimes making contact with their bodies. An officer approached the civilian and other nearby healthcare workers and threatened them with arrest if they did not leave. Another individual at this protest was struck by a baton, handcuffed, and escorted to a holding area where a large group of arrested protestors were being corralled. None of the civilians could fully describe the multitude of officers with whom they interacted.

   The CCRB investigator reviewed hours of BWC footage, which showed that some officers were wearing riot helmets or riot shields with a shield number clearly printed on it. When the investigator interviewed the officers to whom those shield numbers were assigned, however, the officers stated that they were not the officers in the video and could not explain how the other officers had access to their equipment. NYPD records confirmed that the interviewed officers had been deployed to other locations in the city. As a result of the lack of documentation as to which officers were assigned the riot gear, the CCRB was unable to identify the officers engaged in the alleged misconduct and closed the complaint as "Officer Unidentified."

3. **Officers Submitted Illegible Paperwork Regarding Officer Deployments**[13]

   On May 29, 2020, at approximately 9:00 pm in front of the 88th Precinct in Brooklyn, hundreds of protestors gathered for a Black Lives Matter protest. Several officers were stationed around the perimeter of the precinct. The precinct commander, Captain Ryon Malcolm, who was at a separate protest at Fort Greene Park at the time, stated that he heard a protestor say that the crowd was marching to the 88th Precinct. Cpt. Malcom requested a level two mobilization and went to the precinct himself. The NYPD could not produce documentation of the officers who

---

[12] CCRB Case No. 202005994
[13] CCRB Case No. 202004179

were deployed pursuant to Cpt. Malcolm's order. Cpt. Malcolm ordered the assembled officers to "push [protestors] on the sidewalk" and to "push them away." He stated that protestors were throwing objects and he witnessed one protestor smash a patrol car window.

The civilian and a friend were protesting outside the precinct when they were pushed to the ground and had batons shoved into their backs by unidentified officers. They, along with other protestors, were pushed into and pinned against a nearby fence by officers using riot shields. The civilian saw other protestors being wrestled to the ground.

The NYPD submitted the detail roster for the precinct, but most of its 59 pages were illegible. The few pages that were legible showed that officers from various commands were deployed to unknown locations within the boundary of the 88th Precinct. As a result, the CCRB could not identify which officers were present at the stationhouse and could have been involved in the alleged use of force against the civilian and the other protestors.

4. **Officers Assembled from Multiple Precincts and Deployed Citywide Without Documentation of an Assignment**[14]

On June 4, 2020, at approximately 7:30 pm in McCarren Park in Brooklyn, a large group of protestors gathered for a March Against Police Brutality. The protestors marched from the park towards the intersection of Penn Street and Wythe Avenue. The civilian participated in the march with his bicycle. The protestors were blocked at the intersection by 100 to 200 officers standing in a line. The civilian recorded several minutes of the standoff on his cellphone. The protestors began chanting and walking back up the street. The civilian stated that as he began walking away, he saw people running past him and then a white male officer in a white shirt pushed him backward. Another similarly dressed officer told the civilian to "get the fuck on the ground, get the fuck on the ground. Shut the fuck up. You wanted smoke, you got it" as he pushed the civilian. The civilian tripped and fell on the ground. He was surrounded by two to four unidentified officers and was punched on his upper body and head. The civilian started to yell that he was being assaulted and he was turned on his stomach and handcuffed. The civilian lost his eyeglasses after he was handcuffed and could not clearly make out the faces of the officers. The civilian stated that an unidentified officer crushed his eyeglasses with his foot. The civilian was transported from his arrest location without his bicycle, cellphone, and glasses. The civilian never received a voucher for any of his property. Officers interviewed regarding the McCarren Park protest stated that they had all been assigned to Randall's Island in Manhattan. The available NYPD paperwork showed that at least 175 officers (from different commands) were assigned to cover protest-related activity in Brooklyn North; none of the rosters identified specific deployment locations. The CCRB was unable to identify the officers engaged in the alleged misconduct and closed the complaint as "Officer Unidentified."

---

[14] CCRB Case Nos. 202004204, 202004071

**Challenge Three: Collection of BWC footage and other NYPD-controlled cameras**

CCRB investigators reported challenges in obtaining BWC footage from the multitude of protest complaints spanning the city. In several instances, this was because members of service failed to turn on their BWCs in situations mandated by the NYPD Patrol Guide or because the batteries in the BWCs lost their charge because of the duration of the protest deployment. There was also a backlog of unfulfilled BWC requests at the time of the summer protests.

There were challenges with obtaining video footage pursuant to a request submitted to the NYPD, which generally fell into the following categories:

- False positives[15] – the NYPD turned over footage that was either incorrect or irrelevant in response to a video request, resulting in investigators unnecessarily reviewing large amounts of footage.
- False negatives[16] – the NYPD reported that queries for the requested video footage did not return any results, but the footage was later discovered through other means.
- Inconsistent NYPD responses[17] – the NYPD found video footage that was responsive to multiple CCRB requests, but that footage was only sent back in response to some, but not all, of the pending requests.

The CCRB has discussed the existence of false negatives in previous reports as a result of the request, search, and response procedures currently in place in order for investigators to obtain BWC footage.[18] The CCRB does not have direct access to search for BWC footage, therefore investigators must submit a search request to the NYPD based on the information they are able to gather during the early stages of the investigation. After the NYPD conducts the search, it reports the results back to the investigator along with any video footage it was able to find or with a negative response if the query conducted by the NYPD did not produce any results.

The protests resulted in large volumes of recorded data due to increased officer deployments for long periods of time—this seems to have increased the incidence of false positive video data being provided by the NYPD, which CCRB investigators had to comb through before realizing that the video did not have any footage relevant to their investigation.

**Challenge Four: Extensive Delays in MOS Interviews**

For the first few months of the pandemic, the CCRB, like most offices and City agencies, operated remotely. This was for the safety of Agency staff, members of the public, and

---

[15] Case examples – CCRB Case Nos. 202005478, 202004729, 202006194
[16] Case examples – CCRB Case Nos. 202003782, 202004183, 202004586, 202004002, 202003731
[17] Case examples – CCRB Case Nos. 202003897, 202003969, 202004315, 202003782, 202004183
[18] https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20200227_BWCReport.pdf, pp. 53-56; https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/20190710_boardmtg_BWC_memo.pdf

members of the Department, in compliance with the state-wide[19] operational safety protocols. During that time, interviews with members of service were severely delayed because of union resistance to allowing its members to be interviewed remotely.[20] The CCRB announced that it would hold an emergency public board meeting on August 8, 2020, to inform the public of this issue.[21] A few days prior to the meeting, however, the NYPD issued a directive ordering members of service to participate in CCRB interviews or face departmental discipline.[22] This delay affected the closing time for complaints, which was further compounded by the previously discussed delay in document production from the Department.

---

[19] https://www.governor.ny.gov/sites/default/files/atoms/files/offices-interim-guidance.pdf
[20] https://gothamist.com/news/nypds-refusal-comply-misconduct-investigations-cost-months-time-and-effort
[21] https://livestream.com/accounts/8706161/events/3082869/videos/212780242
[22] https://www.nydailynews.com/new-york/nyc-crime/ny-nypd-virtual-interview-civilian-complaint-review-board-20200806-myqry5ksb5c6fd3cseee6zccri-story.html